UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EXPANDED OPTIONS L.P., IRA STIER and EILEEN STIER,<br><br>Plaintiffs,<br><br>v.<br><br>DCG / UGOC EQUITY FUND, LLC; THE UNITED GROUP OF COMPANIES, INC; DCG FUNDS MANAGEMENT, LLC; MICHAEL J. UCCELLINI and JESSICA F. STEFFENSEN as Executor and Executrix, Respectively, of the ESTATE OF WALTER F. UCCELLINI; and MICHAEL J. UCCELLINI.<br><br>Defendants. | Case No. 16-cv-9665<br><br><br>COMPLAINT<br><br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Expanded Option L.P., Ira Stier and Eileen Stier (hereinafter the "Plaintiffs"), through their undersigned attorneys, hereby allege as follows:

## I.      PARTIES

1.      Plaintiff Expanded Options L.P. ("Expanded Options") is a limited partnership organized and existing under the laws of the State of Nevada.

2.      Plaintiff Ira Stier ("Dr. Stier") is an individual residing in Poughkeepsie, New York, with an ownership interest in the DCG/UGOC Equity Fund, LLC, a North Carolina Limited Liability Company, and is the President of Freedom Choice Capital Management, Inc., the general partner of Expanded Options.

3.      Plaintiff Eileen Stier ("Mrs. Stier") is an individual residing in Poughkeepsie, New York, with an ownership interest in the DCG/UGOC Equity Fund, LLC.

4.      Defendant DCG / UGOC Equity Fund, LLC (the "Fund"), a North Carolina

Limited Liability Company, is a private investment fund organized by DCG / UGOC Funds Management, LLC to invest in opportunistic real estate and real estate related sales in the United States, primarily in the eastern United States and to invest in debt securities. The Fund was organized on June 13, 2008, and commenced operations on June 14, 2008. Management and supervision of the Fund is exclusively vested in the Fund's managers.

5. DCG / UGOC Funds Management, LLC (the "Manager") is a North Carolina limited liability and the manager of the Fund responsible for overall management and administration, including acquisition, management and disposition of the Fund assets.

6. Defendant DCG Funds Management, LLC ("DCG," and together with UGFM, the "Managers") is a member of the Manager.

7. Defendant The United Group of Companies, Inc. ("UGOC") is a real estate investment, management and development firm headquartered in Troy, New York and a member of the Manager. UGOC is the managing member of DCG.

8. Defendants Michael J. Uccellini and Jessica F. Steffensen are the duly appointed Executor and Executrix, respectively, of the Estate of Walter F. Uccellini and have been sued in that capacity. Walter F. Uccellini, deceased, was the Chairman and founder of UGOC at all times prior to his death in August 2012 in a plane crash and directed, acted in concert, or aided and abetted in the wrongful acts which caused losses to the Plaintiffs as alleged herein.

9. Defendant Michael J. Uccellini was the President and Chief Executive Officer of UGOC prior to the death of his father Walter Uccellini and directed, acted in concert, or aided and abetted in the wrongful acts which caused losses to the Plaintiffs as alleged herein.

10. At all times relevant to the claims herein, the Manager and DCG were under common control, and controlled and directed the affairs of the Fund. All decisions regarding the

use and investment of Fund assets were to be made by Manager, by and through DCG and UGOC.

11. Walter F. Uccellini was the Chairman of UGOC prior to his death in 2012, and controlled and directed their affairs.

## II. JURISDICTION AND VENUE

12. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as the action arises under federal law as specified herein, and over the supplemental state law claims pursuant to 28 U.S.C. § 1367.

13. Venue is proper in this District Court pursuant to 28 U.S.C. § 1391 in that a substantial part of the events, misrepresentations and omissions giving rise to the claims occurred in this District and certain of the Defendants reside in this District.

## III. CREATION OF THE FUND SECURITIES

14. UGOC was founded in 1972 by Walter Uccellini. During and subsequent to 2008, UGOC and Walter Uccellini represented to the public that, during the history of UGOC, they had developed over $2 billion of real estate projects, acquired more than $500 million in projects, and managed 1.5 million square feet of commercial space and 6,000 residential units.

15. By 2008, UGOC had developed and was managing through an affiliate senior multi-family communities and had launched plans to develop and manage certain student housing projects near SUNY campuses in Plattsburgh, Brockport, and Cortland, New York.

16. The financial crisis facing this country in 2008 created serious financial problems for UGOC and for its plans to finance the student housing projects.

17. As of late 2008, UGOC and Walter Uccellini had been unsuccessful in obtaining bank financing for the projects as well as obtaining funds to cover their own business operations

and personal expenses. During 2008 and 2009, UGOC and Uccellini were desperate for cash and Uccellini was forced to sell his $2 million stake in a country club.

18.     In 2008, UGOC and Walter Uccellini represented to business associates that the pension fund giant TIAA-CREF was prepared to provide UGOC with $50 million of loan financing to develop UGOC projects conditioned upon UGOC first raising $18 million in equity.

19.     In an effort to raise money from individual investors to fund certain of their real estate projects, UGOC, DCG, Management, Walter Uccellini, and Michael Uccellini (hereinafter collectively referred to as the "United Defendants") established, among others, the Fund.

## IV.     TARGETING OF CLIENTS OF PAGEONE FINANCIAL, INC.

20.     In the fall of 2008, Walter Uccellini was introduced to Edgar Page ("Page"), the CEO and Chairman of PageOne Financial, Inc. ("PageOne"), an SEC-registered investment advisor with offices in Malta, New York.

21.     PageOne and its principal Page had long-standing relationships of trust with certain individual investors from New York and surrounding states some of whom had a substantial net worth and each of whom relied upon the advice of Edgar Page in making their investments.

22.     Walter Uccellini told Page of the conditional financing commitment of TIAA-CREF, the United Funds and the UGOC housing projects and requested on behalf of the United Defendants that Page exercise his discretionary control over his clients' accounts to purchase investments in the United Funds.

23.     Page was initially prepared to do so, but, upon checking with the designated custodian of client accounts, TD Ameritrade, learned that client investments in private placements such as the United Funds could not be made without obtaining written consent from

each investor pursuant to the policy of TD Ameritrade.

24. At the suggestion of UGOC, Page requested that TD Ameritrade waive the policy, but it refused to do so.

25. Page indicated to UGOC and Walter Uccellini that he would in the future recommend the United Funds to certain of his clients, but would in the meantime attempt to broker an investment of the $18 million to satisfy the condition of the pending TIAA-CREF loan commitment.

26. Page sought the investment for UGOC through a bridge loan from Bank of New York Mellon and from HOPE Finance, S.A., but the negotiations were unsuccessful.

27. On December 15, 2008, Page committed PageOne to purchasing $18.3 million worth of UGOC preferred stock using its clients' assets. At the same time that Page's commitment was made, UGOC made certain commitments to Page.

28. Walter Uccellini acting on behalf of UGOC agreed to enter into discussions for the purchase of PageOne from Page on the same terms offered to Page by an independent third party, offered to hire Page as manager of the proposed buyer's assets after the acquisition, and agreed to use the political and business connections of a close business associate to refer to Page for managing over $1 billion of assets from labor unions that would become clients of the acquiring company.

29. The commitments made to each other by Page and UGOC were never disclosed to any of the clients of PageOne prior to the investments which they approved for their respective securities accounts managed by PageOne.

30. The United Defendants also agreed to compensate PageOne with the payment of a commission for each sale of United Fund securities sold by Page to any of the clients of

PageOne.

31.     As a result, at all relevant times, Page was an agent of the United Defendants acting for the benefit of and at the direction of the United Defendants and the United Funds. Accordingly, the United Defendants are liable for the acts and omissions of Page and PageOne under the principal agency relationship and the doctrine of respondeat superior.

32.     Plaintiffs were clients of PageOne residing in New York at the time who purchased interests in the Fund upon the advice and recommendation of Page and his principal UGOC.

## V.     THE FUND'S PRIVATE PLACEMENT MEMORANDUM

33.     Effective August 8, 2008, the United Defendants issued a Confidential Private Placement Memorandum ("PPM") for the Fund offering for sale $30 million of Limited Liability Company Membership Interest ("Membership Interest") of $500,000 per investment unit. The securities were unregistered and offered for sale on a private placement basis under the exemption to section 4(2) of the Securities Act of 1933 and Rule 506 of Regulation D promulgated thereunder.

34.     The investment objective and strategy represented in the PPM was for the Fund to invest in acquire, develop, reposition, manage and operate real estate and real estate related assets in the United States, with a primary focus on the eastern United States and to invest in debt securities. The PPM further represented that the Manager were to focus the Fund's investments in the areas where DCG and UGOC had the most expertise and strongest market presence. The PPM further represented that DCG and UGOC have demonstrated the capacity to add value in the markets where the Fund will be focused, specifically in the eastern United States from New York through Florida, and that the specific locations being considered are either in

"built-out" markets where the Manager believes specific demand sectors are underserved such as student and senior housing or strong regional markets such as Charlotte, North Carolina which appear to be continuing to grow even in the present economic climate.

35. The PPM further represented that the Manager is seeking real estate property and other real estate investments that it believes can be converted to cash during the next three to six years.

36. The PPM further represented that the Manager intends to restrict the amount of leverage used in acquiring Investments to no more than 75% of the value if the investment as indicated by an independent third party appraiser either by an "as built" or "as improved" appraisal.

37. The PPM further represented that the Fund will seek investments in new property development, construction and leasing opportunities, existing property acquisitions where it believes the Manager's affiliates can add significant value, and investments in raw land, as well as development and management companies which are involved in its target market sectors.

38. The PPM further represented that the purchase price of investments developed by affiliates of the Manager will be restricted to no more than the investments appraised value plus costs associated with the equity investment by the Company.

39. Pursuant to the PPM, the Fund would have an initial closing and would commence investment activities once it received $500,000 of subscriptions from investors. Until the date which is 18 months following the receipt of the initial $500,000 or until the Fund had secured $30 million of subscription the Manager may have accepted additional subscriptions from existing or new investors and hold subsequent closings of the Fund.

40.     The investment period for the Fund was to end on the fifth anniversary of the first closing date. During the investment period, investors were to receive distributions of the net cash flow of the Fund not less than annually as follows: first, one hundred percent (100%) to such Member until such Member has, received (or been deemed to receive) a return of such Member's capital contribution (net of amounts previously returned) plus a return sufficient to cause such Member to have realized a 12% internal rate of return ("IRR"); (b) second, (i) 85% to such Member and (ii) 15% to the Manager until such Member has realized an 18% IRR; and (c) third, (i) 75% to such Member and (ii) 25% to the Manager.

41.     Although the Fund was sold using the PPM, the PPM was never updated to reflect material changes in the factual representations or to provide material, supplemental information after July 22, 2008 which affected the investment decision and was necessary to make the PPM accurate and non-misleading. Prior to raising the full amount of $30 million for the Fund, the United Defendants closed the Fund.

## VI.     INVESTMENTS IN THE FUND

42.     The sale of securities in the Fund remained open from 2008 through December 31, 2010, and resulted in aggregate proceeds of approximately $8.25 million.

43.     However, the United Defendants improperly and unlawfully elected to use the Equity Fund as a bank account to help fund UGOC operations and their struggling projects.

44.     In a February 2009 email from Walter Uccellini to Page, he stated "if we cannot have several million dollars collected (in our hands to be spent) by next week, it might very well be necessary to shut down the student housing jobs and then this whole undertaking will have been for naught." Investors were never informed that UGOC's financial position was this dire. Investor funds were routinely diverted by UGOC from investment in projects as had been

represented to investors, and used instead to sustain UGOC's failing operations.

45.     The Fund's assets were not invested in the manner represented in the PPM. Instead, the Manager used Fund assets to purchase securities in Plattsburgh Suites, LLC, Cortland Suites, LLC, Brockport Suites, LLC, and Kinderkill Development, LLC (the "LLC Investments").  Each of those entities were parties related to UGOC and under the control of Walter Uccellini and UGOC.

46.     In addition, the Manager used Fund assets to pay directly or indirectly personal expenses for Walter Uccellini, his family members and other related UGOC entities. Each of the United Defendants had knowledge of and approved or ratified UGOC's diversion of investor monies in the Fund to sustain UGOC operations, pay personal expenses of the Uccellini family, make unsecured loans to related entities, and to make payments to Page for the acquisition of PageOne as hereinafter set forth.

## VII.    THE STUDENT HOUSING PROJECTS

47.     From the beginning of the Fund's investments in the LLC Investments, there were construction and other problems that rendered these investments highly risky and imprudent.

48.     The $23 million project called the College Suites at Plattsburgh was located next to the SUNY campus. The project fell behind schedule and opened late in the fall of 2009, missing most of the market for college students in the area. Thus, the first full year of operation wasn't until the beginning of the 2010-2011 school year at SUNY Plattsburgh.

49.     Occupancy in that first year never reached 70% and continued to fall below projections and representations thereafter. Furthermore, the housing facility off campus had nearly 400 beds which was considered by the University too large for the market considering

SUNY Plattsburgh had only 5,600 undergraduates and offered plenty of on-campus housing.

50. Plattsburgh Suites, LLC was in default of its loan agreement and Forbearance Agreement with Key Bank National Association in 2012, was the subject of foreclosure proceedings in 2013 and 2014 for default under its loan and mortgage instruments and filed for bankruptcy in 2015.

51. The Brockport Suites and Cortland Suites projects faced similar problems from 2010 to 2013 with low occupancy levels and loan defaults which resulted in the filing of foreclosure actions by the lender General Electrical Capital Corporation ("GECC").

52. On December 10, 2014, the ownership entities for Brockport and Cortland executed deeds in lieu of foreclosure to GECC, thereby extinguishing the investment of the United Funds in these two projects.

## VIII. PLAINTIFFS' INVESTMENTS IN THE FUND

53. Prior to their investment, Plaintiffs met with Page and Mr. James Quinn, UGOC's Vice President, CPA and in-house counsel to discuss plaintiffs' investment of assets into the Fund.

54. At that meeting, UGOC provided the Fund's PPM to plaintiffs and told plaintiffs about UGOC's long-standing, excellent reputation in the Albany area of building several buildings and projects. The Fund is the next in line for success, and is a sound investment. UGOC also told plaintiffs that building student housing is such a sound investment and b/c of the downturn of the economy and schools have increased enrollment and, as a result, student-housing is a successful investment. UGOC further told Plaintiffs that UGOC has returned an average 23% rate of return on their other projects.

55. In reliance on the PPM and the representations at that in-person meeting, Plaintiff

Expanded Options made invested approximately $1,119,500 in the Equity Fund in March / April 2009.

56.     In reliance on the PPM and the representations at that in-person meeting, Plaintiff Dr. Stier invested approximately $670,000 in the Equity Fund in March / April 2009.

57.     In reliance on the PPM and the representations at that in-person meeting, Plaintiff Mrs. Stier invested approximately $32,000 in the Equity Fund in March / April 2009.

58.     At the time of each purchase, Plaintiffs executed Subscription Agreements for the purchase of interests in the Fund and executed the Fund's operating agreement.

## IX.     MISREPRESENTATIONS AND/OR NON-DISCLOSURES TO PLAINTIFFS RELATING TO THE FUND

59.     In connection with the sale of Membership Interests in the Fund to Plaintiffs, the United Defendants and its agent Page misrepresented in the PPM that the Fund would invest in real estate and real estate related assets, whereas the Fund instead invested in securities of the LLC Investments.

60.     In connection with the sale of Membership Interests in the Fund to Plaintiffs, United Defendants and Page failed to disclose the following facts that were material to the investment and were necessary to render the disclosed facts non-misleading: (i) that UGOC and its related entities were in serious financial distress and were unable to survive without the investor funds; (ii) that UGOC did not have sufficient capital or bank financing to maintain operations and had used Fund assets to cover its operating costs on an unsecured basis;; (iii) that the Fund under the direction of its Manager controlled by Walter Uccellini had invested close to 100% of its assets in securities in the LLC Investments, and not real estate or real estate related assets; and (iv) that Fund investments made by the Fund to UGOC and related entities prior had been used in part to cover personal expenses of Walter Uccellini and his family members and

that such investments would continue to be used in that manner.

**X.  DISCLOSURES RELATING TO THE RELATIONSHIP BETWEEN THE UNITED DEFENDANTS AND EDGAR PAGE AND PAGEONE FINANCIAL**

61.     In connection with the purchase of their interests in the Fund, Plaintiffs were provided with the PPM for the Fund.

62.     All of the United Defendants were involved in the preparation and/or authorization of all disclosures made to investors, including Plaintiffs, in the PPM and in oral communications with Page and any of his clients.

63.     The United Defendants caused the PPM to be sent to Plaintiffs directly or through Page and PageOne, utilizing the mails or interstate wires, at or about the times of the Plaintiffs' investments alleged herein.

64.     The United Defendants represented in the PPM and elsewhere that UGOC was a nationally recognized firm for the development and management of real property and that it was an industry leader in the student, senior, and multi-family housing development sectors.

65.     Nowhere in the PPM, the Fund Operating Agreement, or any other document provided to Plaintiffs in connection with their investment in the Fund did the United Defendants make any disclosures concerning any financial arrangements between UGOC on one hand, and Page and PageOne on the other hand, or that any of the assets of the United Funds had been used and would continue to be used to pay Page for the proposed acquisition of PageOne by UGOC.

66.     With regard to compensation, the PPM included only a general representation as to compensation of Placement Agents (along with a materially similar representation in the Fund Operating Agreement):

> The Manager may retain placement agents (the "Placement Agents") to assist in the private placement of Interests in the Fund. The Fund will be responsible for paying the placement agent fees

of the Placement Agents (the "Placement Agent Fees"). Investors solicited by such persons will be advised of, and asked to consent to, any such compensation arrangement. In addition, the Placement Agents may, from time to time and in their sole discretion, waive all or part of the Placement Agent Fees in respect of certain other investors.

67.     After Plaintiffs became investors in the Fund, the Defendants caused the Fund to send statements, letters and other correspondence to Plaintiffs, not one of which included any further disclosure of any financial arrangements with Page and PageOne.

## XI.     SEC PROCEEDINGS

68.     Several years after the Plaintiffs made the investment, a United States Securities and Exchange Commission ("SEC") proceeding against Page and PageOne revealed that UGOC had procured Plaintiffs' investment through fraudulent misrepresentations and omissions, and fraudulent acts and devices. The SEC Proceeding revealed that UGOC had secretly agreed to purchase PageOne from Page in exchange for Page directing his clients to use their assets to invest in the United Funds. The SEC Proceeding also revealed that UGOC had used investor money in the United Funds to make payments to Page in connection with the PageOne purchase agreement. On August 26, 2014, the SEC instituted administrative and cease-and-desist proceedings pursuant to Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940 and Section 9(b) of the Investment Company Act of 1940 against Page and PageOne.

69.     On March 10, 2015, following the submission by Page and PageOne of an Offer of Settlement, the SEC issued an Order Making Findings in the SEC Proceeding ("Findings Order") The SEC Findings resolved the liability portion of the administrative proceeding,  which concluded that Page and PageOne had "willfully violated Sections 206(1) and 206(2) of the [Investment Advisers Act of 1940], which prohibit fraudulent conduct by an investment

adviser[,]" (Findings Order ¶ 40), as well as Section 207 of the Advisers Act "which makes it 'unlawful for any person willfully to make any untrue statement of a material fact in any registration application or report filed with the Commission . . . or willfully to omit to state in any such application or report any material fact which is required to be stated therein.'" (Findings Order ¶¶ 41, 42b.)

70. The SEC Proceeding revealed that Page and PageOne failed to disclose conflicts of interest in connection with the solicitation of investments for the UGOC.

71. The undisclosed conflict of interest centered on UGOC's incentivizing of Page and PageOne to raise capital for the United Funds, through offers to acquire PageOne.

72. The SEC proceeding in its Cease & Desist Order also revealed that in late 2008, Page entered into an agreement with UGOC whereby UGOC would acquire PageOne which encompassed the following:

A. UGOC would pay approximately $3 million, to be paid in installments over time.

B. The acquisition would not close, and UGOC would not make the final payments of the purchase price, until Page raised approximately $20 million for UGOC's funds.

73. The SEC proceeding also determined that sometime prior to April 2010, Page and UGOC agreed to revised terms, whereby UGOC would acquire 49% of PageOne for approximately $2.4 million, a figure that was later increased to approximately $3 million.

74. The SEC proceeding also determined that Page had begun recommending the UGOC funds to his clients beginning in early 2009. Between March 2009 and September 2011, the clients of Page and PageOne invested between approximately $13 million and $15 million in the UGOC funds.

75. Over roughly this same time period, UGOC made installment payments on the

acquisition of approximately $2.7 million. UGOC made these payments directly to Page, PageOne and other entities and persons, at Page's direction.

76.     The approximately $2.7 million in payments by UGOC represented approximately 18% of PageOne's clients' investments in the UGOC funds.

77.     Critically, Defendants knew that the funds Page was raising were necessary to fund the UGOC's installment payments. As explained by the SEC in its findings,

> Page and PageOne knew (or recklessly disregarded) that the timing of [UGOC's] acquisition payments – which often followed very closely in time behind PageOne clients' investments in the [United funds] – was linked to those investments. First, Respondents had explicitly agreed to raise money for the [United funds] as a term of the acquisition. Thus, on at least one occasion, E. Page emailed [UGOC's] founder and Chairman (the "Chairman") to notify him that a PageOne client had invested in the Private Funds and to ask for an acquisition payment. Moreover, E. Page understood that the Chairman and [UGOC] did not have sufficient liquidity of their own to complete the acquisition of PageOne. Indeed, E. Page understood that the Chairman was, at the time, selling certain personal assets to keep [UGOC's] business going. (Findings Order ¶ 15)

78.     As further explained by the SEC, during the time period that UGOC was making the installment payments, Page was personally liable on promissory notes to repay the installment payments if the UGOC acquisition did not close:

> The acquisition payments were memorialized as promissory notes from E. Page to [UGOC]. E. Page understood, from the Chairman, that – in the event that the acquisition was consummated – the [UGOC] would cancel the notes. However, he likewise understood that until the acquisition closed and [UGOC] cancelled the notes, E. Page was personally liable for the notes. Indeed, E. Page expressed just this concern to the Chairman, writing in an email in January 2010 that, as a result of the acquisition not closing, "I have a large loan 'lliability' [sic] and no assets." (Findings Order ¶ 16.)

79.     The UGOC knowingly utilized Page and PageOne to continue to raise capital:

> Over the course of 2010 and 2011, E. Page became increasingly concerned that the acquisition would not close. He understood that he had not been able to raise the $20 million, a condition precedent for the

acquisition. And, he knew or recklessly disregarded that [UGOG] had not been able to otherwise raise sufficient funds to pay the balance on the acquisition price. In both 2010 and 2011, the Chairman made increasingly urgent appeals to E. Page to assist [UGOC] in fund-raising, for example, telling him of his "need" to raise money and saying that he "desperately need[ed]" E. Page's help in doing so. (Findings Order ¶ 36 (emphasis supplied).)

80. Particularly notable is the timing of the Plaintiffs' investments in the Fund. As explained above, the Plaintiffs made their investments in the Fund weeks after a February 2009 email from Walter Uccellini to Page, where Walter Uccellini stated "if we cannot have several million dollars collected (in our hands to be spent) by next week, it might very well be necessary to shut down the student housing jobs and then this whole undertaking will have been for naught."

## XII. FRAUDULENT SCHEME OF THE DEFENDANTS

81. The United Defendants knowingly and recklessly engaged in the scheme to lure investors, including Plaintiffs, into the Fund, using Page and PageOne as their agent and alter ego, through material false statements and omissions and fraudulent acts and devices, relating to the Fund and relating to the undisclosed business relationship with Page and PageOne.

82. As explained above, neither the United Defendants nor Page disclosed any facts to Plaintiffs concerning the financial arrangement between UGOC, PageOne and Page, nor disclosed any of the material facts concerning the Fund. With particular respect to the acquisition of PageOne, the United Defendants falsely stated, with regard to Private Placement Agent fees, "Investors solicited by such persons will be advised of, and asked to consent to, any such compensation arrangement."

83. In fact, the United Defendants knowingly concealed material facts, including, but not limited to the fact that (i) UGOC had entered into an agreement to acquire PageOne; (ii)

UGOC had already made substantial installment payments pursuant to the acquisition agreement; (iii) UGOC and UCFM were utilizing proceeds of Page's and PageOne's clients' investments to fund the on-going installment payments; (iv) in the absence of the proceeds of Page's and PageOne's clients' investments, UGOC lacked funds to make the installment payments; (v) Page and PageOne faced massive financial liability if the acquisition did not close, and (vi) each of the misrepresentations and omissions specifically alleged in paragraphs 113 and 114 herein.

84. The United Defendants knew that the disclosures to the Plaintiffs the PPM, other documentation, and oral communications with UGOC and Page provided in connection with their investments in the Fund were false or made in reckless disregard of their truth or falsity and omitted to disclose material facts that were necessary to make the statements made non misleading.

85. The United Defendants were also aware of the timing of Plaintiffs' investments (by virtue of their receipt of documentation and ultimately the proceeds associated with Plaintiffs' investments) and actively utilized Page and PageOne to continue to raise money for their own benefit and to fund the installment payments to Page and PageOne.

86. The United Defendants had a motive to continue the fraudulent solicitation of investors such as Plaintiffs through the false and misleading disclosures, in that, among other things, (i) they needed cash to fund the installment payments under the acquisition agreement; (ii) they needed cash to fund intended investments in securities in which the United Defendants intended to participate, and from which the United Defendants stood to profit on both the investments and management and other fees; and (iii) the investments in the Fund would generate additional management and other fees for the United Defendants.

## XIII. DAMAGES SUFFERED BY THE PLAINTIFFS

87. But for the false and misleading representations, statements and omissions alleged herein, Plaintiffs would not have invested in the Fund.

88. In the initial decision of the SEC dated June 25, 2015, ALJ Patil found, "Page recommended investments with a high degree of risk, and Page's clients ran the risk of substantial losses." ALJ Patil further found:

> While [Page and PageOne] are correct that the poor performance of the [United] Funds is not at least exclusively their fault, it is certainly their fault that their clients were that their clients were recruited to invest in the [United] Funds under false pretenses and without upfront disclosure of a significant conflict of interest. . . . Further, Page acknowledged that making a full and complete disclosure of the conflict of interest - including that he was working on selling at least some of PageOne while routing funds to the buyer – would have made clients "extremely nervous" and would be "too dangerous" – presumably because the clients would no longer want to do business with [Page and PageOne]. . . . (Initial Decision at 5 [citations omitted]).

89. Not only are Plaintiffs stuck with an investment they would not have chosen had they known the truth, but their funds are now locked up under the control of the United Defendants. Under the terms of the operating agreement governing the Fund, Plaintiffs are unable to liquidate their investment without the approval of the United Defendants.

90. In fact, Plaintiffs' investments in the Fund constituted a significant portion of their available investment funds, and, in the case of Dr. Stier and Mrs. Stier, their investment represented more than substantially all of their net worth.

91. Plaintiffs' investment in the fund was procured through unlawful conduct and is subject to rescission and/or recovery of monetary damages.

92. In or after March 2015, Plaintiffs learned that Page and PageOne had been found responsible for committing securities violations in connection with the sale of, among other funds, the Fund.

93.     The Plaintiffs' interest in the Fund is essentially worthless.

## FIRST CAUSE OF ACTION
### (Section 10(b) and Rule 10b-5)

94.     Plaintiffs incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint as if fully rewritten herein.

95.     United Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Act"), 15 U.S.C. 78a *et seq.* and Rule 10b-5, 17 C.F.R. § 240.10b-5.

96.     Plaintiffs have thereby been damaged.

## SECOND CAUSE OF ACTION
### (Fraud)

97.     Plaintiffs incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint as if fully rewritten herein.

98.     United Defendants knowingly, and with intent to defraud, made representations and omissions that were materially false and misleading, upon which Plaintiffs justifiably relied.

99.     Plaintiffs have suffered damages as a result of the United Defendants' fraud.

## THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty)

100.    Plaintiffs incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint as if fully rewritten herein.

101.    PageOne and Page had a fiduciary relationship with Plaintiffs, their clients, involving a special trust, confidence and reliance on the fiduciaries to exercise their discretion and expertise for recommending the purchase and sale of securities for their investment accounts.

102.    PageOne and Page as fiduciaries were forbidden from acting in any manner adverse or contrary to the interests of Plaintiffs or from acting for their own benefit or the benefit

of others in relation to the purchase of investments for Plaintiffs' accounts.

103. The United Defendants had knowledge of the fiduciary relationship between PageOne and Page on the one hand and Plaintiffs on the other hand and directed their agents PageOne and Page to breach their duty of loyalty and their duty of prudence to Plaintiffs by causing them to purchase Membership Interests in the Fund based on misrepresentations of material fact contained in the PPM and in oral communications as alleged herein and by omitting to disclose material facts necessary to make the representations non-misleading as alleged herein.

104. By reason of the relationship of respondent superior or principal and agent by and between the United Defendants and PageOne and Page as alleged herein, the United Defendants also had a fiduciary relationship with Plaintiffs.

105. The United Defendants breached their duty of loyalty and duty of prudence to Plaintiffs by the false representations of material facts, and by the omissions to disclose material facts, as alleged herein, that were made to Plaintiffs by UGOC and Page.

106. Alternatively, the United Defendants aided and abetted Page and PageOne in making false representations and omissions which breached the fiduciary duties of Page and PageOne to Plaintiffs.

107. As a proximate result of the breaches of fiduciary duty, Plaintiffs have been damaged in a sum to be determined at trial.

108. The actions of the United Defendants were willful, wanton and malicious, and Plaintiffs are entitled to recover their reasonable attorney fees and punitive damages.

### FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation)

109. Plaintiffs incorporate by reference each of the allegations contained in the

preceding paragraphs of this Complaint as if fully rewritten herein.

110. In the sale of securities to Plaintiffs, the United Defendants had a duty to disclose all material information necessary for investors such as Plaintiffs to determine whether or not to purchase security interests in the Fund and to understand the value of their investments after purchase.

111. The United Defendants and their agent Page made misrepresentations of fact omitted to disclose to Plaintiffs material facts.

112. Each of the misrepresentations and omissions of material fact were negligently and recklessly made by the United Defendants.

113. The United Defendants knew or should have known that the misrepresentations and omissions were negligently and recklessly made to Plaintiffs and would deceive Plaintiffs, cause them to make investments in the Fund securities and conceal their wrongdoing.

114. Each of the misrepresentations and omissions to disclose were material to the decision of Plaintiffs to purchase interests in the Fund and not to discover the wrongdoing of the United Defendants until 2015.

115. Plaintiffs justifiably and reasonably relied upon the negligent and reckless misrepresentations and omissions.

116. As a proximate result thereof, Plaintiffs were damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (UNJUST ENRICHMENT)

117. Plaintiffs incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint as if fully rewritten herein.

118. The financial benefits received by the United Defendants were detrimental to

and at the expense of Plaintiffs who innocently relied upon the misrepresentations and omissions made by the United Defendants and their agent.

119. As a proximate result thereof, the United Defendants have been unjustly enriched and equity and good conscience require that the Court order restitution of the losses sustained by Plaintiffs from their investment in the Fund.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand:

A. On all causes of action, a judgment against United Defendants, jointly and severally, for all compensatory damages, including, but not limited to, rescissionary damages, in an amount to be determined at trial;

B. On all causes of action, an order of rescission against United Defendants in favor of Plaintiffs encompassing no less than the following: (i) the full principal invested by Plaintiffs in the Funds; (ii) all accrued interest and divided on Plaintiffs' investment in the Funds; and (iii) all fees charges to Plaintiffs by United Defendants;

C. On all causes of action, against United Defendants, punitive damages in an amount to be determined at trial.

D. All of Plaintiffs' costs and disbursements;

E. All of Plaintiffs' attorneys' fees and expenses; and

F. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: December 14, 2016  
      Stamford, Connecticut

Respectfully submitted,

GORA LLC


By: /s/ Richard S. Gora  
    Richard S. Gora  
    Gora LLC  
    9 West Broad St., Suite 550  
    Stamford, CT 06902  
    Tel.: 203-424-8021  
    Fax: 203-549-0410  
    Email: Rich@goralaw.com

*Of Counsel*

Sinead Rafferty  
Gora LLC  
9 West Broad St., Suite 550  
Stamford, CT 06902  
Tel.: 646-298-8523  
Fax: 203-549-0410  
Email: Sinead@goralaw.com

*Attorneys for Plaintiffs*